**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ORGAN RECOVERY SYSTEMS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 11 C 4041** |
| ) | |
| **PRESERVATION SOLUTIONS, INC.,** ) | |
| **GARY L. SWANSON, BRIDGE TO** ) | |
| **LIFE, LTD., and BTL SOLUTIONS,** ) | |
| **LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Organ Recovery Systems, Inc. (ORS) has sued Preservation Solutions, Inc., its

president Gary L. Swanson, Bridge to Life, Ltd., and BTL Solutions, LLC, for breach of

contract, false advertising and unfair competition under the Lanham Act, deceptive

trade practices, and consumer fraud. Both Preservation Solutions and Swanson

(collectively PSI) and Bridge to Life and BTL Solutions (collectively BTL) filed motions to

dismiss ORS's first amended complaint, which the Court granted in part. *Organ*

*Recovery Systems, Inc. v. Preservation Solutions, Inc.*, No. 11 C 4041, 2012 WL

116041 (N.D. Ill. Jan. 16, 2012). Both PSI and BTL have now moved to dismiss ORS's

second amended complaint. In addition, BTL and PSI have each filed counterclaims

against ORS, and ORS has moved to dismiss those claims. In this decision, the Court

rules on each of the motions to dismiss.

**Background**

In considering each party's motion to dismiss, the Court takes as true the facts alleged by the party whose complaint or counterclaim is challenged. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The Court will discuss the allegations in more detail as necessary.

ORS's allegations are substantially similar to those the Court discussed in its previous decision, with which the Court assumes familiarity. ORS provides two solutions that are used to preserve kidneys during transplant procedures. One of these solutions, "KPS-1," is based on a freely available recipe developed by the University of Wisconsin. ORS attempted to improve the solution's packaging and shelf life. It entered into a contract with PSI to have PSI assist with testing, manufacturing and obtaining regulatory approval for KPS-1. The contract prohibited PSI from using or disclosing ORS's confidential information.

Since 2008 or 2009, BTL has competed with ORS in the organ preservation solutions market. The two companies sell formulas based on the same solutions and have focused on innovations in packaging and storage. ORS alleges that PSI misappropriated ORS's confidential information by using it in FDA applications and delivering it to BTL. ORS also makes a series of allegations regarding communications by BTL and/or PSI to current or prospective ORS customers that suggested false or damaging information about ORS products.

In its previous decision, the Court granted in part defendants' motions to dismiss an earlier version of ORS's complaint. Specifically, the Court dismissed claims by ORS against PSI for breach of fiduciary duty and for imposition of a constructive trust (as a

2

separate claim rather than a remedy). The Court also dismissed ORS's claim against all defendants for civil conspiracy.

**Discussion**

**A.    ORS's amended complaint**

**1.    Counts one and two**

In its amended complaint, ORS asserts two claims against PSI alone. In count one, ORS alleges that PSI breached a "confidentiality agreement" that the two businesses made in 2000 "for the purpose of exploring the possibility of engaging PSI to perform work for ORS involving the development of and improvements to organ preservation solutions." 2d Am. Compl. ¶ 21. The agreement states that ORS "desires to explore the possibility of engaging [PSI] for the purpose of prototype & development of disposables and [illegible]." *Id.*, Ex. A at 1. According to ORS, PSI breached its obligations under the confidentiality agreement by "among other things, filing 510K applications with the FDA impermissibly based on ORS's Confidential Information and/or using ORS's Confidential Information in the design and development of packaging and label claims for organ preservation solutions sold and offered for sale by BTL and/or others." *Id.* ¶ 103.

In count two, ORS claims that PSI breached a 2002 contract between the parties under which PSI agreed to create solutions. PSI does not seek dismissal of count two. It contends, however, that count one should be dismissed because the 2000 confidentiality agreement merged into the 2002 contract. The 2002 contract contains a provision stating that it "is the entire agreement between [ORS and PSI] concerning the

provision of the services described in Exhibit B (Statement of Work)." *Id.*, Ex. B at 2. The contract also "supersedes any prior agreements (including without limitation any non-disclosure agreements) proposals or other communications, oral, written, between the parties with respect to the Services." *Id.* Exhibit B to the agreement indicates that PSI agrees to undertake five projects, including "processing specifications to support the initial 510(k) for KPS-1," "initial production of KPS-1," and "design modification to packaging and shelf-life extension." *Id.*, Ex. B at 10.

"It is well settled under the doctrine of merger and the parol evidence rule that a written agreement which is complete on its face supersedes all prior agreements on the same subject matter." *Barille v. Sears Roebuck and Co.*, 289 Ill. App. 3d 171, 177, 682 N.E.2d 118, 123 (1997). ORS does not appear to contest that the 2000 confidentiality agreement merged into the parties' later contract. In particular, ORS does not argue that the 2002 agreement is incomplete on its face, and it does not argue that the two documents concern different subject matter. ORS does argue, however, that "to the extent ORS entrusted Confidential Information to PSI prior to January 30, 2002, it was subject to the terms of the Confidentiality Agreement and any misappropriation would be subject to the terms of the Confidentiality Agreement." ORS Resp. to PSI Mot. to Dismiss at 10.

ORS does not allege that PSI did anything impermissible before the 2002 contract became effective. Rather, it alleges only that it entrusted PSI with confidential information while the confidentiality agreement was in effect. ORS offers no legal support for its argument that a breach of the 2000 confidentiality agreement that occurred, if at all, only after the 2002 contract is separately actionable under the earlier,

4

merged agreement. The Court agrees with PSI that the earlier contract merged into the later one and therefore dismisses count one.

### 2. Count three

#### a. ORS's claims against PSI

In count three, ORS asserts claims under section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), against both sets of defendants. "Section 43(a)(1)(B) of the Lanham Act . . . forbids the use of any false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, or qualities of the seller's or another person's goods." *Schering- Plough Healthcare Prods. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 503 (7th Cir. 2009) (citing 15 U.S.C. § 1125(a)(1)(B)) (brackets and ellipses in original omitted).

ORS's Lanham Act claims against PSI appear to be based solely on a letter that PSI sent on September 12, 2011 to (among others) an Illinois organ procurement organization ("OPO") called Gift of Hope Organ & Tissue. The letter reads as follows:

> Dear OPO Administrator:
>
> We have been informed that one of the companies that has distributed UW Cold Storage Solution in compliance with the Preservation Solutions Inc. (PSI) FDA 510K applications, K073693, K083453, and K091245 is presently distributing a Solution not manufactured by PSI. . . .
>
> This is critical to you and your patients for the following reasons:
>
> 1. The instructions for use allowed for the substituted product may be different from PSI's UW Cold Storage Solution.
>
> 2. The PSI product has been stability tested, reviewed and certified for storage and shipping at room temperature. (USP definition)

3. The PSI UW Cold Storage Solution has been stability tested, reviewed and certified for use without a final filter. PSI's UW Cold Storage Solution is certified to meet both USP and European Pharmacopeial limits for endotoxin.

The transplant solution is an integral part of your organ transplant procedure. We know that patient safety is paramount and that full disclosure is essential to protecting your patient. Please check the product label to determine the manufacturer of the solution being supplied to your center.

2d Am. Compl., Ex. I. ORS alleges, on information and belief, that "PSI sent the same letter to OPO administrators, hospitals and other potential ORS customers throughout the country" and that "[n]umerous customers and potential customers have expressed confusion and concern regarding the content of PSI's letter." *Id.* ¶¶ 95-96. ORS alleges that two OPO employees contacted ORS to follow up on PSI's letter and that a third e-mailed other OPOs asking if "anyone know[s] what is going on?" *Id.* ¶¶ 98- 100.

"To establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).

In its motion to dismiss, PSI first argues that ORS does not allege the type of conduct that § 43(a) is intended to reach – essentially, that the letter does not qualify as "commercial advertising or promotion." "Advertising is a subset of persuasion and

refs to dissemination of prefabricated promotional materials." *Zurich Ins. Co. v. Amcor Sunclipse North America*, 241 F.3d 605, 607 (7th Cir 2001). The Seventh Circuit has stated "that § 43(a) addresses 'promotional material disseminated to anonymous recipients.'" *Sanderson v. Culligan Intern. Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (quoting *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 804 (7th Cir. 2001)). This definition contrasts "a form of promotion to anonymous recipients" with "face-to-face communication" such as "a person-to-person pitch by an account executive." *First Health Group*, 269 F.3d at 803.

In this same vein, the Seventh Circuit determined that "three . . . supposedly false . . . person-to-person communications at trade shows" did not qualify as advertising under § 43(a). *Sanderson*, 415 F.3d at 624. The court has also noted that "letters sent to customers do not come within the scope of § 43(a)(1)(B)." *ISI Intern., Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003). The Seventh Circuit has never held, however, that "anonymous" must mean that a corporation cannot know the identities of the recipients of the communications.

This Court has recently determined that commercial advertising or promotion within the meaning of § 43(a) may consist of "unsolicited statements to numerous potential clients with which [an advertiser] had no relationship." *Gov't Payment Serv., Inc. v. LexisNexis VitalChek Network, Inc.*, No. 12 C 1946, 2012 WL 1952905, at *5 (N.D. Ill. May 29, 2012). This Court has also noted determinations from other circuits stating that to be covered under § 43(a), representations must "involve commercial speech by a defendant, for the purpose of influencing customers to buy the defendant's

goods or services, and must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Installation Servs., Inc. v. Elec. Research, Inc.*, No. 04 C 6906, 2005 WL 645244, at *2 (N.D. Ill. Mar. 21, 2005). Another court has concluded that "where the potential purchasers in the market are relatively small in number a single promotional presentation to an individual purchaser may be sufficient to invoke the protections of the Lanham Act." *Derby Indus., Inc. v. Chestnut Ridge Foam, Inc.*, 202 F. Supp. 2d 818, 822-23 (N.D. Ind. 2002).

PSI contends that ORS's Lanham Act claim fails because "actionable advertising must be anonymous" and ORS has alleged only "[p]erson to person statements" by PSI. PSI Reply at 2-3. ORS, however, has alleged that the letter was received by "potential ORS customers throughout the country." 2d Am. Compl. ¶ 95. The fact that the letter that ORS submitted with its amended complaint is addressed "Dear OPO Administrator" rather than to a named individual or business supports ORS's suggestion that it was a mass unsolicited communication. The Court concludes that even if PSI's letter was specifically targeted to OPOs – which would mean that PSI knew the identities of all recipients based on its mailing list – ORS has alleged that the letters were a generalized solicitation rather than an individualized communication. For this reason, ORS has not failed to allege "commercial advertising or promotion."

PSI next argues that ORS has not alleged that the letter had the necessary effect on customers. Because ORS is arguing not that the letter made false statements but rather that it made statements that "may be literally true or ambiguous, but which implicitly convey a false impression [or] are misleading in context," ORS must "prove

that the statement is misleading in context by demonstrated actual consumer confusion." *Hot Wax*, 191 F.3d at 820.  The Court agrees with ORS that claims that three OPO employees expressed confusion – two of them directly to ORS – allege customer confusion sufficiently to survive PSI's motion to dismiss.  These allegations could also support a finding that ORS is "likely to be injured as a result of" PSI's statements.  *See id.* at 819.

For these reasons, the Court declines to dismiss count three as against PSI.

### b.      ORS's claims against BTL

BTL makes an argument similar to one of PSI's arguments:  apart from one press release, the communications that ORS contends provide a basis for a Lanham Act claim do not constitute "commercial advertising or promotion."  In response, ORS argues that several of its allegations independently support the claim and those that do not should be construed in the aggregate.

In a section of its complaint entitled "BTL's Misrepresentations," ORS alleges that a BTL officer sent a "broadcast email to 'Organ Procurement Professional[s]'" stating falsely that it was "Bridge to Life that made the FDA approved label change for the room-temperature storage of UW solution possible."  2d Am. Compl. ¶ 65.  ORS argues that it was ORS itself, not BTL, that enabled the label change and that for BTL to imply otherwise is damaging to ORS.  ORS alleges that BTL issued a press release in April 2009 that contained similar information.  *Id.* ¶ 74.

Both of these statements can support a claim that BTL engaged in advertising or commercial speech.  Even if ORS knew all of the businesses that would receive the

broadcast e-mail, the allegations would allow for a finding that the e-mail was not specifically targeted to any of them individually. Rather, as characterized by ORS, the e-mail was an anonymous communication not in the sense that a television commercial is anonymous, but in that it was a generic communication to a large group, and each recipient was provided with the same material.

ORS alleges that "BTL attempted to acquire one of ORS' customers, New England Organ Bank, by making false and disparaging remarks about ORS" and that "[u]pon information and belief, BTL has made similar statements to other potential customers and ORS's existing customers as well." *Id.* ¶ 70. These allegations cannot serve as the basis for a Lanham Act claim because they describe individualized communications. The Lanham Act does not cover every instance in which a business speaks to the customer of another business, even if the speaker is lying. ORS alleges that this act occurred because BTL was specifically trying to acquire a particular customer. Whether or not this might be actionable under another legal theory, it does not amount to "advertising" for purposes of the Lanham Act.

The same is true of ORS's allegations that it and BTL both responded to a call for proposals from a transplant organization in the United Kingdom and that BTL's response improperly included false statements about ORS. BTL's statements were individualized communications, as were the two additional examples of person-to-person communications listed in the amended complaint – ORS alleges that named BTL personnel "told" something to named OPO personnel. 2d Am. Compl. ¶¶ 84-85. This is likewise true of ORS's allegation that "BTL has told organ preservation solution customers that ORS has had a recall of SPS-1 when, in fact, it was BTL that had a

recall of its static preservation solutions." *Id.* ¶ 89. Although ORS contends that these communications are examples of a larger advertising campaign, the manner in which they are alleged in the amended complaint does not permit that characterization.

The Court therefore declines to dismiss count three in its entirety as against BTL but circumscribes ORS's claims to those the Court has indicated may viably be characterized as advertising within the meaning of § 43(a).

### 3. Counts four and five

#### a. ORS's claims against PSI

In count four, ORS asserts a claim under the Illinois Uniform Deceptive Trade Practices Act (IUDTPA), 814 ILCS 510/2, against both sets of defendants. In count five, it asserts a claim under the Illinois Consumer Fraud ACT (ICFA), 815 ILCS 505/2, against both sets of defendants.

ORS bases its claims against PSI on two sets of allegations. First, ORS alleges that PSI is liable under IUDTPA and ICFA for the conduct discussed in the previous section, because "claims under [IUDTPA and ICFA] rise and fall with . . . Lanham Act claims." *M. Arthur Gensler, Jr. & Assocs., Inc. v. Strabala*, No. 11 C 3945, 2012 WL 600679, at *3 (N.D. Ill. Feb. 21, 2012) (citing *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998)). PSI argues that because the Lanham Act claims are deficient, these claims fail as well. The Court has determined, however, that ORS's Lanham Act claim based on PSI's letter survives. PSI offers no other argument regarding why this portion of ORS's IUDTPA claim or its ICFA claim should be dismissed.

ORS's IUDTPA claim also contains allegations that PSI "engaged in unfair and deceptive trade practices by exploiting ORS's Confidential Information for [its] own gain" by filing "applications with the FDA impermissibly based on ORS's Confidential Information" and using the information "in the design and development of the packaging for BTL's organ preservation solutions." 2d Am. Compl. ¶¶ 122-24.[1] After the Court issued its previous decision in this case, PSI filed a motion seeking clarification. At a hearing on the motion, the Court stated:

> I don't think the complaint alleges that PSI itself ever made a deceptive claim about its products in the way that it alleges that BTL did. On the other hand, the plaintiff has alleged the PSI made the solutions for BTL using the plaintiff's confidential information. And that at least in theory could fit under a section of the [IUDTPA] as other conduct creating a likelihood of confusion. The complaint can be read, I think fairly, as saying that PSI and Swanson as the makers of the solution then supported and profited from this sort of what the statute calls a deceptive practice. . . .
>
> So I'm, frankly, not quite sure as I sit here exactly what the theory is that the plaintiff is advancing on Count 4, but I guess I'm not prepared to dismiss it at this point. It may be that what ought to happen is it ought to be repled in some way, or it maybe ought to be tweaked, I guess.

Feb. 6, 2012 Tr. at 6-7.

PSI appears to suggest that ORS's failure to "tweak" its allegations mandates dismissal. The Court did not state, however, that ORS was required to alter its complaint in order for this claim to survive. As the Court indicated during the hearing, ORS's allegations of conduct by PSI provide a sufficient basis for a claim that PSI can be found to have engaged in "other conduct which similarly creates a likelihood of

---

[1]Although the amended complaint indicates that ORS asserts a claim based on this confidential information against BTL as well as PSI, neither BTL's motion to dismiss nor ORS's response mentions the point.

confusion or misunderstanding."  815 ILCS 510/2(a)(12).

For these reasons, the Court declines to dismiss count five as against PSI.

### b.    ORS's claims against BTL

BTL argues that ORS has failed to allege a significant connection between the conduct at issue and Illinois, which both IUDTPA and ICFA require.  The Illinois Supreme Court has held that ICFA does not "apply to fraudulent transactions which take place outside Illinois."  *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 185, 835 N.E.2d 801, 853 (2005).  The "critical question" in deciding whether an in-state transaction occurred is "whether the circumstances relating to [the] disputed transactions . . . occurred primarily and substantially in Illinois."  *Id.* at 187, 835 N.E.2d at 854.  "The place of injury or deception is only one of the circumstances," however, and a case in which "the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only thing that occurs out-of-state is the injury or deception," the claim may be actionable.  *Id.* at 187, 835 N.E.2d at 853.

The Seventh Circuit has noted that the *Avery* standard is "not exactly self defining."  *Morrison v. YTB Intern., Inc.*, 649 F.3d 533, 538 (7th Cir. 2011).  The Illinois Supreme Court did indicate, however, that factors including the following were suggestive of a claim that may be brought under IUDTPA and ICFA:  "(1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant's principal place of business was in Illinois; (3) the contract contained express choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant's performance were to

13

be directed to its Chicago office; and (5) payments for the defendant's services were to be sent to its Chicago office." *Avery*, 216 Ill. 2d at 189, 835 N.E.2d at 855.

Bridge to Life (one of the two defendants referred to in this opinion collectively as BTL) is a Delaware corporation that has its principal place of business in Illinois. ORS is also headquartered in Illinois. "The fact that a scheme to defraud was disseminated from a company's headquarters in Illinois is insufficient" without more. *Phillips v. Bally Total Fitness Holding Corp.*, 372 Ill. App. 3d 53, 58, 865 N.E.2d 310, 315 (2007). In this case, however, both the plaintiff and one of the defendants are headquartered in Illinois. (Defendants use "BTL" in the counterclaim, referring to themselves collectively, allowing for an inference that the circumstances of "BTL's" transactions were the same for both of them.) It is likely that the disputed communications – which include press releases and a blast e-mail – originated in Illinois and that ORS felt harm in Illinois. In that event, even if all of the disputed communications reached only out-of-state plaintiffs, that would not necessarily place the acts beyond ICFA's reach. *Avery*, 216 Ill. 2d at 187, 835 N.E.2d at 853. The Court declines to dismiss count four on this basis at this stage of the proceedings.

BTL argues that IUDTPA claims are subject to the same territoriality requirement as ICFA claims. *See LG Elecs. USA, Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 859- 61 (N.D. Ill. 2011). Other than its argument that IUTDPA claims are also analyzed under the Lanham Act, BTL offers no other argument that the Court should dismiss count five. For the reasons already stated, the Court declines to do so.

**4.     Count six**

In count six, ORS asserts a claim against BTL for tortious interference with prospective economic advantage.  To succeed on this claim under Illinois law, a plaintiff must prove "(1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages."  *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007).

BTL argues that ORS's complaint fails to identify anyone with whom ORS had an actual "expectation of a future business relationship."  Illinois courts require a plaintiff to demonstrate a "sufficiently strong expectancy" that he or she would receive a particular economic advantage and have rejected claims by, for example, a plaintiff who alleged only having "undergone several interviews [and] been invited back for further interviews."  *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 409-411, 667 N.E.2d 1296, 1300-01 (1996); *see also Aslam v. Bd. of Educ. of City of Chi.*, No. 06 C 4920, 2008 WL 3978562, at *8 (N.D. Ill. Aug. 25, 2008) (dismissing claims by plaintiff "relying on . . . merely the hope of being eligible to receive a job offer in the future"); *Automated Concepts, Inc. v. Weaver*, No. 99 C 7599, 2000 WL 1134541, at *7 (N.D. Ill. Aug. 9, 2000) ("[A] 'track record' of receiving work from a particular customer in the past, in and of itself, does not establish a reasonable expectation of . . . entering into any particular future business relationship."); *Hoopla Sports and Ent., Inc. v. Nike, Inc.*, 947 F. Supp. 347, 358 (N.D. Ill. 1996) ("[A]lthough a plaintiff need not allege that it had a firm offer in hand prior to the alleged interference, mere allegations that the plaintiff was involved in

the process of negotiations with a third party were insufficient.").

For the most part, BTL is correct that ORS has failed to plead an actual expectancy. For example, as the Court indicated earlier, ORS emphasizes an incident in which both ORS and BTL responded to a British OPO's "request to submit a proposal to supply the UK with static cold storage solution." 2d Am. Compl. ¶ 79. The OPO then "relied on BTL's misrepresentation [about the quality of ORS's solutions] in making [its] purchasing decisions." Id. ¶ 82. The Court concludes that ORS's allegations regarding this incident are insufficient because there is no indication that there was an actual business expectancy. Mere unsuccessful solicitation does not give rise to a tortious interference claim.

ORS cites two cases in support of its claims. In one, a resort developer successfully alleged that there was a business expectancy after he received a letter of interest from a large hotel company and "entered into preliminary negotiations" about a property. *Clarage v. Kuzma*, 342 Ill. App. 3d 573, 577, 795 N.E.2d 348, 353 (2003). In the other, "allegations that negotiations regarding an exclusive supply agreement were conducted" were sufficient. *Laser Inds., Ltd. v. Eder Instrument Co.*, 573 F. Supp. 987, 993 (N.D. Ill. 1983). ORS argues that these cases show that allegations of "preliminary stages of negotiation are sufficient" to support a claim for tortious interference. ORS Resp. to BTL Mot. to Dismiss at 12. Even that is true, ORS has not alleged that it had entered any kind of negotiations with the British OPO, but only that it responded to a call from proposals. ORS has not alleged any response from the British OPO indicating interest or the initiation of a business relationship, and this allegation therefore cannot support ORS's tortious interference claim against BTL.

16

ORS also alleges that BTL made misrepresentations to three specific OPOs and alleges generally that ORS has made "misrepresentations to consumers" and that "consumers have relied on the same or similar misrepresentations made by BTL in making their purchasing decisions." 2d Am. Compl. ¶¶ 81-86. With one exception, these allegations suffer from the same problem as those in the previous paragraph: even if BTL's communications influenced the consumers' decisions, there is no allegation that ORS had a prospective business arrangement or a relationship of any kind with them.

ORS does allege that BTL made misstatements to Juan Ramirez, an employee of One Legacy OPO. "[B]ased on his belief that BTL's solutions were the only 'Belzer UW' solutions in the marketplace, and after having previously orally committed to purchasing ORS's products, [the employee] chose to purchase BTL's products instead." *Id.* ¶ 86. ORS's statement that it had received a commitment from One Legacy to purchase its product constitutes a sufficient allegation of a business expectancy.

BTL argues, however, that the allegations regarding Ramirez cannot support a claim because ORS has not alleged that BTL had "knowledge of that expectation." *See Ali*, 481 F.3d at 944. The Court agrees. Nothing in ORS's amended complaint suggests, generally or specifically, that BTL knew that Ramirez had agreed to purchase ORS products or had entered a business relationship with ORS in any way.

For these reasons, the Court dismisses count six.

## B.    BTL's counterclaim

### 1.    Count one

In count one of its counterclaim, BTL alleges that ORS has engaged in monopolization in violation of the Sherman Act, 15 U.S.C. § 2.  BTL alleges that ORS dominates the organ preservation solutions market and has utilized anti-competitive tactics – primarily the filing of this lawsuit – to drive BTL out of business and punish PSI for working with BTL.  According to BTL, this has, among other things, "increased costs to customers by preventing competitive entrants from reaching economies of scale." BTL Countercl. ¶ 76.

The "offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 396-97 (7th Cir. 2000) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)) (internal quotation marks omitted).  BTL must also allege that ORS's conduct has caused "antitrust injury" because "private antitrust litigation is limited to suits by those persons for whose benefit the laws were enacted."  *Robert F. Booth Trust v. Crowley*, __ F.3d __, No. 10-3285, 2012 WL 2126314, at *1 (7th Cir. June 13, 2012).

ORS argues that BTL's allegations are insufficient to meet each of these three requirements.  First, ORS argues that BTL has not alleged facts sufficient to establish that ORS has monopoly power in the relevant market.  "Monopoly power is the power to

control prices or exclude competition." *United States v. E.I. du Pont Nemours & Co.*, 351 U.S. 377, 391 (1956). It "is a seller's ability to charge a price above the competitive level (roughly speaking, above cost, including the cost of capital) without losing so many sales to existing competitors or new entrants as to make the price increase unprofitable." *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 594 (7th Cir. 2008). "Monopoly" does not mean that there is only one seller – "a seller who has a large market share may be able to charge a price persistently above the competitive level despite the existence of competitors." *Id.*

In its response to ORS's motion to dismiss, BTL relies in large part on the Seventh Circuit's statement that it has not "rule[d] out [the] approach" of "relying solely on market share as a basis for inferring market power . . . especially . . . where there are barriers to entry and no substitutes from the consumer's perspective." *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990). BTL contends that its allegation that ORS has a sixty-eight percent market share is sufficient to allege monopoly power when considered along with the barriers to entry posed by the FDA approval process and the small number of participants in the organ preservation solutions market.

*Wilk*, however, does not concern the definition of monopoly power. Rather, the quoted discussion involves the concept of market power in a Sherman Act § 1 case, which is defined as "the ability to raise prices above the competitive level by restricting output." *Id.* at 359. "Monopoly power under § 2 requires, of course, something greater than market power under § 1." *Eastman Kodak*, 504 U.S. at 481. Market power may well be a factor to consider in determining whether a business has monopoly power, but

BTL provides no support for the proposition that an allegation of market share accompanied by the *Wilk* factors is sufficient to survive a 12(b)(6) motion on a § 2 claim.

The only other fact that BTL argues is indicative of monopoly power is that in "2008 to 2009, ORS implemented massive price increases (300% or higher) for some of its products, including the 'kits' that are necessary for the use of its machine perfusion pumps." BTL Countercl. ¶ 31. The ensuing paragraph of the counterclaim states, "ORS exercises monopoly power in the organ preservation solution market, as evidenced by its ability to unilaterally impose large price increases on its customers." *Id.* ¶ 32. ORS argues that these allegations are irrelevant because the relevant market in this case is that of organ solutions, not kits, and the price increase is indicative only of ORS's power in the kits market.

The Court agrees that the language in paragraph thirty-one provides no indication of ORS's power in the organ preservation solutions market, and paragraph thirty-two is a legal conclusion. The statement about price increases thus cannot provide an additional basis for finding monopoly power, leaving BTL with only its allegations regarding market power. As the Court has explained, these allegations are insufficient.

If a plaintiff "fail[s] to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly, [its] § 2 claim may be properly dismissed" on a Rule 12(b)(6) motion. *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) (internal quotation marks and citation omitted). In *Endsley*, the Seventh Circuit considered allegations that the tolls for the

Chicago Skyway bridge were higher than what was needed to meet operating costs, violating § 2.  The court concluded that plaintiffs had failed to allege "that defendant had enough market power to create a monopoly" because "very viable" alternative options were available to consumers even though the Skyway was "more desirable."  *Id.* at 282-83.  "If the Skyway tolls become too high, drivers will take one of the alternate routes."  *Id.* at 283.

BTL has not alleged that no viable alternatives exist for customers who find ORS's prices for organ preservation solutions to be too high.  Although a firm need not be the only seller in a market to exercise monopoly power, BTL's allegation that its "sales account for approximately 28 percent [of] both the static and machine perfusion forms of Wisconsin-formula solutions" cuts against an implication that customers lack other options.  BTL Countercl. ¶ 20.  The same is true of BTL's allegation that "ORS has been forced to reduce its prices or forestall price increases due to the competitive presence of BTL in the marketplace."  *Id.* ¶ 29.

The Court concludes that BTL has not alleged facts sufficient to support a finding that ORS has exercised monopoly power at any time relevant to this lawsuit.  The Court therefore dismisses count one of BTL's counterclaim.

**2.    Count two**

In count two of its counterclaim, BTL alleges, based on essentially the same facts set forth in count one, that ORS has engaged in conduct that constitutes attempted monopolization in violation of the Sherman Act.  "[I]t is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant

has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

BTL argues that it has alleged anti-competitive acts, primarily based on ORS's filing of this lawsuit. BTL contends that the lawsuit amounts to sham litigation and that ORS's claims are objectively baseless. Since the filing of this lawsuit, BTL alleges, it "has been forced to divert most of its available revenue away from research on pioneering organ preservation technology and into a legal defense against ORS's sham and baseless claims." BTL Countercl. ¶ 25. "BTL has had no choice but to reduce its research and development efforts, which will delay the introduction of these new and improved products to the organ transplant community." *Id.* BTL also argues in its brief that ORS has used the lawsuit to try to capture the production of organ preservation solutions by, for example, seeking the placement of PSI's assets in a constructive trust. BTL contends that because ORS has an exclusive relationship with an entity that BTL alleges is the only other manufacturer of organ preservation solutions in the country, ORS's success in this lawsuit – or even its continued prosecution of the suit – will drive BTL and PSI out of the marketplace. If the lawsuit turns out to be baseless, BTL argues, that will indicate that ORS filed the suit in bad faith to produce exactly these effects.

ORS argues that even if it had filed a sham lawsuit, it would not be liable under the Sherman Act based on that alone. BTL's allegations, however, concern not just the filing of this suit but ORS's alleged use of it to gain effective control of the manufacture of organ preservation solutions. The Court agrees with BTL that if ORS's actions and

22

motivation are as alleged, that would constitute an anti-competitive act.

BTL must also allege a "dangerous probability of achieving monopoly power," which requires that "the antitrust defendant currently has market power and that such market power will tend to approach monopoly power if the alleged unlawful conduct remains unchecked." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 901 (N.D. Ill. 2009). "Market share indicates market power only when sales reflect control of the productive assets in the business, for only then does it reflect an ability to curtail total market output." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989).

ORS makes no argument specifically directed at count two, and it does not discuss at all the question of its probability of achieving monopoly power. The Seventh Circuit has recommended "the greatest restraint in condemning any unilateral practice as 'monopolization'" because "any firm's unilateral conduct is almost always deemed lawful unless it creates a dangerous probability of success in monopolizing." *Schor v. Abbott Labs.*, 457 F.3d 608, 613 (7th Cir. 2006). If ORS acted in the manner described in the previous paragraphs, however, and if it succeeded in driving BTL and PSI out of the marketplace, ORS would end up with a market share of nearly ninety percent. It would also have an exclusive relationship with the only remaining manufacturer. Thus if BTL and PSI were to leave the marketplace, ORS would almost certainly achieve monopoly power. Assuming the truth of BTL's allegations, therefore, BTL has sufficiently alleged the dangerous probability element of an attempted monopolization claim.

ORS also argues that BTL has failed to allege that ORS's conduct could cause an antitrust injury. "Antitrust law condemns practices that drive up prices by curtailing output." *Sanderson*, 415 F.3d at 623. The injury must be the result of anti-competitive behavior, meaning "injury resulting from acts that either reduce output or raise prices to consumers." *Medrad, Inc. v. Sprite Dev., LLC*, No. 08 C 5088, 2011 WL 3900730, at *3 (N.D. Ill. Sept. 6, 2011); *see also Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 714 (7th Cir. 2003) (rejecting claim of antitrust injury when "losses [do not] stem from . . . behavior that is anticompetitive, *e.g.*, predatory pricing"). According to ORS, BTL's allegations regarding the lawsuit fail to include facts regarding prices or output. The Court disagrees. BTL's claim is essentially that ORS is trying to prevent BTL from succeeding in the marketplace, which would leave ORS as the only real option for consumers. BTL also alleges that ORS is trying to control output by trying to disable PSI. Taking BTL's allegations in the light most favorable to BTL, as required at this stage of the proceedings, it has sufficiently alleged that ORS's success in its alleged endeavor would have a high likelihood of lowering output and raising prices of organ preservation solution. The Court accordingly declines to dismiss the count two on this basis.

ORS argues that if a claim based on sham litigation survives, the Court should stay count two and the associated discovery until the end of this lawsuit. At that point, if ORS has prevailed in its action against BTL, BTL's sham litigation counterclaim necessarily will fail because a successful claim, by definition, cannot constitute sham litigation. *See, e.g.*, *Rubloff Dev. Group, Inc. v. SuperValu, Inc.*, ___ F. Supp. 2d ___,

2012 WL 1032784 (N.D. Ill. Mar. 27, 2012) (citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993)) ("As to the sham lawsuit branch, the lawsuits must first be objectively meritless before any exploration of subjective intent can be undertaken.  A successful action, by definition, cannot be objectively meritless.").

ORS has also separately moved the Court for a stay.  BTL argues that a stay is inappropriate because it would lead to needless duplication of extensive discovery proceedings.  For example, BTL argues that delaying discovery would result in the need to re-depose several witnesses at additional inconvenience and expense at a later point in time, when those witnesses' memories of the relevant events will be less clear than it is today.  BTL argues that a stay will also lead to further disputes between the parties as they fight about whether particular discovery requests are relevant only to antitrust issues.  BTL also claims that the motion comes too late, having been filed four months after BTL filed its counterclaim and after a significant amount of discovery has already been exchanged.

The Court concludes that a stay is justified.  As described above, success by ORS on one or more of its claims would leave BTL unable to prevail on count two.  The discovery on ORS's claims and the antitrust counterclaim is not so intertwined so as to make a stay pointless.  The Court is unpersuaded that it will be unable to sort out relevance issues as BTL contends.  On the flip side, a stay may allow all concerned to avoid a great deal of expensive and time-consuming discovery.  The Court grants ORS's motion for a stay of discovery with regard to count two of BTL's counterclaim.

### 3.	Count three

In count three, BTL asserts a claim for abuse of process based on its arguments that this lawsuit is a sham.  "In order to state a claim for abuse of process, the pleading must allege the existence of an ulterior purpose or motive and some act in the use of legal process not proper in the regular prosecution of the proceedings."  *Reed v. Doctor's Assocs, Inc.*, 355 Ill. App. 3d 865, 875, 824 N.E.2d 1198, 1206 (2005).  BTL argues that it has "allege[d] in detail that ORS brought its sham litigation to interfere with BTL's business" and that "Illinois courts hold that suits brought for such purposes are 'not proper' and state a claim for abuse of process."  BTL Resp. to ORS Mot. to Dismiss at 11.

ORS responds that BTL has mischaracterized the nature of a claim for abuse of process.  The Court agrees:

> Unlike malicious prosecution, which involves filing a baseless suit to harass or intimidate an antagonist, abuse of process is the use of the litigation process for an improper purpose, whether or not the claim is colorable.  "The gist of the abuse of process tort is said to be misuse of legal process primarily to accomplish a purpose for which it was not designed, usually to compel the victim to yield on some matter not involved in the suit . . . .  If the plaintiff can show instigation of a suit for an improper purpose without probable cause and with a termination favorable to the now plaintiff, she has a malicious prosecution or a wrongful litigation claim, not a claim for abuse of process."

*Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 963 (7th Cir. 2010) (quoting 2 Dan B. Dobbs, *The Law of Torts* § 438 (2001)).  "The mere institution of proceedings, even with a malicious motive, does not in and of itself constitute abuse of process."  *Landau v. Schneider*, 154 Ill. App. 3d 875, 878, 506 N.E.2d 735, 737 (1987).

BTL essentially alleges that ORS's entire lawsuit was designed to drive BTL out of business by subjecting it to overly burdensome attorneys' fees. BTL cites two cases in support of its allegations. BTL argues that the judge in the first case denied a motion to dismiss because the bringing of a lawsuit to interfere with business can support a claim. The judge in that case, however, noted that the claimant alleged that the plaintiff was using the proceedings to hire an employee and interfere with a particular business relationship. *Junction Solutions, LLC v. MBS Dev., Inc.*, No. 06 C 1632, 2007 WL 4234091, at *4 (N.D. Ill. Nov. 20, 2007).

BTL's second case does include language to the effect that "harassment, economic hardship, and distraction from the marketplace in order to control the market are acts in the use of legal process." *Helene Curtis Inds., Inc. v. Milo Corp.*, No. 84 C 5217, 1985 WL 1282 (N.D. Ill. May 2, 1985). To the extent that this case implies that simply filing a lawsuit for these purposes gives rise to a claim of abuse of process, however, the Court concludes that subsequent Seventh Circuit precedent has foreclosed this contention. *See Nightingale*, 626 F.3d at 963; *Evans v. West*, 935 F.2d 922, 923 (7th Cir. 1991) ("Absent an 'inappropriate act' in the regular prosecution of a suit, an abuse of process action will not lie."). Because BTL has not alleged an "inappropriate act" beyond filing and maintaining the instant lawsuit, the Court dismisses count three of BTL's counterclaim.

### 4.     Count four

Section 5 of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/5, provides: "If a claim of misappropriation is made in bad faith . . . the court may award reasonable

27

attorney's fees to the prevailing party." In count four of its counterclaim, BTL alleges that it is entitled to damages under ITSA based on the following events. ORS initiated this lawsuit with a complaint that included allegations that ORS's "trade secrets" had been stolen. After BTL moved to dismiss the complaint, ORS filed an amended complaint that did not include the phrase "trade secrets." In the amended complaint, ORS classified the information that had been the subject of its trade secrets claim as "confidential information," the misappropriation of which was the basis for a claim of civil conspiracy. The Court granted BTL's motion to dismiss this claim, concluding that ORS had not alleged anything other than the misappropriation of information and that the claim was therefore preempted by ITSA.

ORS argues that this sequence of events does not render BTL a "prevailing party" for purposes of the statute. ORS points out that it voluntarily filed a new complaint that did not include a trade secrets claim and that the claim the Court dismissed did not implicate ITSA because it sought a separate remedy. BTL responds that there is "no doubt that, absent the unlikely contingency of a reversal on appeal, ORS could never revive its misappropriation claim." BTL Resp. to ORS Mot. to Dismiss at 12. As ORS notes, however, BTL cites no authority to support its assertion that the Court's dismissal of ORS's civil conspiracy claim can support BTL's current ITSA damages claim just because the dismissed claim involved the same factual allegations and the word "misappropriation." BTL's contention is also unconvincing in light of the fact that ITSA provides that it "does not affect . . . other civil remedies that are not based upon the misappropriation of a trade secret." 765 ILCS 1065/8(b)(2). The Court concludes that BTL has not shown that ITSA permits a defendant to recover damages

as a prevailing party when a plaintiff has dismissed its own claim.  The Court therefore grants ORS's motion to dismiss count four of BTL's counterclaim.

### 5.    Count five

In count five of its counterclaim, BTL asserts a claim against ORS under § 43(a) of the Lanham Act.  BTL contends that ORS has engaged in false advertising by misrepresenting that it has FDA approval to sell its SPS-1 solution with a label indicating that the solution does not need to be filtered before use.  BTL attaches to its counterclaim two documents retrieved from ORS's website.  The documents appear to be pamphlets or brochures, and they include statements that no filter is necessary for the use of ORS products.

ORS argues that this claim cannot survive not because the communications do not constitute advertising, but because ORS has, in fact, received approval from the FDA. In support of this argument, ORS submits four letters.  The first is a letter from an FDA employee to ORS's director of regulatory affairs.  In the letter, the FDA asked ORS to address marketing concerns, including the fact that the product as labeled did not include a filtering requirement.  In its response to the FDA's letter, ORS stated, "Data comparing unfiltered SPS-1 to filtered SPS-1 solutions demonstrate that unfiltered SPS-1 is equivalent to filtered SPS-1 solutions."  ORS Mot. to Dismiss BTL Countercl. Ex. B at 5.  ORS's response to the FDA also stated that ColStorSol, PSI's name for the solution that ORS purchased and marketed as SPS-1, had been approved for marketing without a filtering requirement.

In a subsequent letter to ORS, the FDA stated that it had found that SPS-1 was "substantially equivalent . . . to legally marketed predicate devices."  *Id.* Ex. D at 1.  The

FDA told ORS that it "may, therefore, market the device, subject to the general controls provisions of the Act [which] include requirements for . . . labeling, and prohibitions against misbranding." *Id.* ORS argues that the Court may take judicial notice of these documents and that they unambiguously indicate that the FDA approved ORS's labeling practice, which in turn would preclude a claim that ORS's advertisement was false.

The Court agrees that the documents appear consistent with ORS's assertion that the FDA has approved the practices regarding which ORS responded. Even were the Court to consider these documents in the context of a Rule 12(b)(6) motion, however, neither the counterclaim nor these documents contain sufficient details about FDA practice for the Court to say that the letter constitutes "approval" for purposes of this particular claim. The Court therefore declines to dismiss count five.

## C.    PSI's counterclaim

In its counterclaim, PSI asserts claims under the Lanham Act § 43(a), IUDTPA, and ICFA. All three claims are premised on PSI's allegations that after it rejected a proposed exclusivity agreement with ORS, ORS terminated PSI's services and engaged another manufacturer. The solutions produced by the other manufacturer have been substandard, PSI says, resulting in several of ORS's customers noticing problems with the solution and raising complaints. PSI alleges that ORS solicited business by telling prospective customers about PSI's services and that ORS's current customers therefore believe that the solutions are made by PSI. Because ORS did not inform its customers that it was switching manufacturers, PSI says, the customers now believe that PSI is responsible for the defective solutions. PSI also alleges that ORS

30

continues to use an instructional insert stating that the solution does not have to be filtered before use.  This insert was originally added by PSI, further confusing consumers regarding the current source of ORS's solutions.

In count three of its counterclaim, PSI asserts claims under Lanham Act § 43(a) based on this alleged conduct.  PSI does not indicate in its counterclaim precisely what portion of this section forms the basis for its claim.  It argues in its briefs, however, that ORS is liable for "passing off" its goods as PSI's and that it used a "false designation of origin."  Thus the claim will succeed only if PSI shows that ORS "uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of [its] goods."  15 U.S.C. § 1125(a)(1)(A).

ORS states repeatedly that it is under no "legal or regulatory duty" to disclose the identity of or change in its manufacturers.  PSI's claims, however, are premised not on the existence of a separate legal duty but on the allegation that certain conduct by ORS has caused confusion.

ORS contends that PSI's allegations cannot support a false designation claim under the Lanham Act because of two binding cases.  In the first, the Supreme Court held that incorporation of an uncopyrighted video into a copyrighted videotape did not provide a basis for a claim of false designation of origin.  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003).  The Court stated that the "'origin' of 'goods' . . . is the producer of the tangible product sold in the marketplace."  *Id.* at 31. In the second case, the Seventh Circuit found that a furniture manufacturer's claim

against another manufacturer for the uncredited use of its pre-made table legs likewise could not survive. *Bretford Mfg., Inc. v. Smith System Mfg. Co.*, 419 F.3d 576, 581 (7th Cir. 2005). The court noted in that case that "the question is whether the consumer knows who has produced the finished product." *Id.* "As far as [the consumer] was concerned, the table's 'origin' was Smith System, no matter who made any component or subassembly." *Id.*

ORS argues that even though PSI manufactures the solution, the solution itself is not the finished product. Rather, the product is solution labeled and bagged by ORS, thereby rendering it ORS's product regardless of who made the solution itself. ORS argues that it can be held liable only if it "falsely represents, as its own, a tangible 'good' manufactured by [PSI]." ORS Reply at 8. According to ORS, the solution is only a component of the tangible good – it is more akin to the wood in the table rather than to the table itself.

PSI maintains that its claim is for "passing off" (leading customers to believe that the ORS-sold solution is PSI's product) rather than "reverse passing off" (selling PSI's solution under ORS's name). Although *Bretford Manufacturing* dealt with reverse passing off, the case focuses on what alleged conduct can support a claim for false designation of origin. The case's focus on the finished product for purposes of a false designation claim is pertinent whether the claim is for passing off or reverse passing off.

Either way, however, the Court does not find ORS's arguments convincing at this point. PSI's allegations clearly suggest that the customers at issue believe that they are buying solution. The solution is not just a component of its package; it is a tangible product. By contrast, a customer who buys a table likely would not consider the

32

purchase to be "wood" or "legs." PSI's allegations that customers have asked it to provide more information about its solutions further support its implication that the customers understand the product they are purchasing to be coming from PSI. *See Bretford Mfg.*, 419 F.3d at 580 (considering whether product incorporated "design elements" that "consumers understand . . . to signify the goods' *origin* and not just its attributes") (emphasis in original). The Court concludes that *Dastar* and *Bretford Manufacturing* do not bar PSI's Lanham Act claim.

ORS also argues, however, that PSI's complaint is insufficiently specific to meet the standards of Rule 9(b). "Claims alleging false representation under the Lanham Act are subject to Rule 9(b)." *MPC Containment Sys., Ltd. v. Moreland*, No. 05 C 6973, 2006 WL 2331148, at *2 (N.D. Ill. Aug. 10, 2006) (citations omitted). The Court agrees that PSI's allegations, at least in their current form, do not meet Rule 9(b)'s requirements. The only allegations made other than in conclusory form are the following: PSI alleges that "an OPO in Philadelphia, Pennsylvania that recently purchased SPS-1, believing that it was still being manufactured by PSI, complained to PSI that its product was off color." PSI Countercl. ¶ 25. PSI also alleges that "an OPO in Nebraska contacted PSI after receiving SPS-1 with two lot numbers in order to confirm if the products had been manufactured by PSI (or by another manufacturer)" and that "[o]n information and belief, other OPOs have been similarly confused regarding the current source of KPS-1 and SPS-1. *Id.* ¶¶ 26-27.

The Court agrees with PSI that this suggests that the customers believed that PSI was making the solution, and that they therefore had not been informed otherwise.

The counterclaim, however, contains no detail whatsoever about the manner in which these customers came to believe, or the reason that they continue to believe, that PSI manufactured the solutions in the first place. Although false designation claims need not involve allegations that the defendant misused a specific logo or mark, there does need to be some indication that the defendant made a false representation. *Cf. Illinois Tool Works, Inc. v. Chester Bros. Machined Prods., Inc.*, No. 05 C 5002, 2006 WL 2191982, at *3 (N.D. Ill. July 27, 2006) ("Though misbranding can give rise to a false designation claim, such claims can also be based on representations that lead consumers to believe that the mark's owner sponsored or otherwise approved [its] use.").

PSI states "on information and belief" that "when ORS began using PSI as the manufacturer of its KPS-1 and SPS-1 solutions, it informed each of the OPOs to which it was selling the solutions that they had been manufactured by PSI." *Id.* ¶ 22. Without any indication, however, of what method ORS used to provide this information – what designation, design element, advertising, solicitation, or other means of communication – the allegation falls short of what Rule 9(b) requires. *See Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 865 (N.D. Ill. 2009) (general allegations on information and belief, without factual specifics, that defendants used a mark in promotional materials to sell "goods and services" was insufficient to survive motion to dismiss). Similarly, although PSI alleges that ORS's continued use of PSI's instructional insert is confusing, it has not provided a copy of the insert. Nor has PSI identified any characteristics of the insert that might lead customers to identify the solution with PSI even though ORS is responsible for the rest of the packaging. The Court concludes that count three, in its

current form, must be dismissed.

In counts one and two, PSI asserts its own IUDTPA and ICFA claims, which it argues are subject to essentially the same legal standard as each other. *See Unichem Corp. v. Gurtler*, 148 Ill. App. 3d 284, 292, 498 N.E.2d 724, 729 (1986) (passing off under the IUDTPA involves "the deception of a consumer as to the source of a product."); *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99 C 1300, 2001 WL 58950, at *8 (N.D. Ill. Jan. 28, 2001) (quoting 815 ILCS 505/2) ("[L]iability under ICFA] may arise upon 'the use or employment of any practice described in Section 2 of [IUDTPA] in the conduct of any trade or commerce."). PSI does not dispute ORS's contention that IUDTPA and ICFA claims regarding passing off are subject to the pleading requirements of Rule 9(b). *See Nakajima All Co., Ltd. v. SL Ventures Corp.*, No. 00 C 6594, 2001 WL 641415, at *6 (N.D. Ill. June 4, 2001) (IUDTPA claims); *Karpowicz v. General Motors Corp.*, No. 97 C 1390, 1997 WL 413929, at *6 (N.D. Ill. 1997) (ICFA claims).

For the reasons the Court has explained, PSI has not made sufficiently specific allegations of conduct by ORS that resulted in customer confusion. In addition, as ORS points out, PSI has alleged no acts connecting the allegations to Illinois other than the fact that ORS is headquartered here. As the Court discussed above regarding ORS's claims against BTL, "[t]he fact that a scheme to defraud was disseminated from a company's headquarters in Illinois is insufficient." *Phillips*, 372 Ill. App. 3d at 58, 865 N.E.2d at 315.

For these reasons, the Court dismisses PSI's counterclaim.

**Conclusion**

For the reasons stated above, the Court grants ORS's motion to dismiss PSI's counterclaim [docket no. 78]; ORS's motion to dismiss as to counts one, three, and four of BTL's counterclaim [docket no. 82]; PSI's motion to dismiss as to count one of ORS's complaint [docket no. 121]; BTL's motion to dismiss as to count six of ORS's complaint [docket no. 117]; and ORS's motion for a stay of discovery relating to count two of BTL's counterclaim [docket no. 128].  The Court otherwise denies the motions to dismiss.

_____ s/ Matthew F. Kennelly _____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 4, 2012